**MUTUAL LIFE INS. CO. OF NEW YORK**
**v. HASSING.**
No. 2622.

Circuit Court of Appeals, Tenth Circuit.
March 16, 1943.

Grant H. Bagley, of Salt Lake City, Utah (P. T. Farnsworth, Jr. and W. Q. Van Cott, both of Salt Lake City, Utah, on the brief), for appellant.

David J. Wilson, of Ogden, Utah, for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The Mutual Life Insurance Company of New York (appellant) issued three policies on the life of Clifford Eugene Hassing, in the face amounts of $1,000, $2,000, and $3,000, respectively, and his wife, Chloie P. Hassing (appellee), was made the beneficiary of each. The policies contained double indemnity clauses for accidental death. Two of them provided for double indemnity "upon receipt of due proof that such death resulted from bodily injury effected solely through external, violent and accidental means * * * upon the conditions set forth in Section 1." Section 1 provides, "The double indemnity will be payable upon receipt of due proof that the insured died as a direct result of bodily injury effected solely through external, violent, and accidental means, independently and exclusively of all other causes * * * provided that the double indemnity shall not be payable if death resulted * * * directly or indirectly from disease or bodily or mental infirmity." The third policy is not materially different in form or substance. All of the policies were executed and delivered in the State of Utah.

On November 30, 1941, while all of the said policies were in full force and effect, the insured was accidentally killed by a train in Ogden, Utah. After this suit was filed by the beneficiary in the state court to recover the face amount and the double indemnity on each of the policies, the case was removed to Federal court, based on diversity of citizenship and requisite amount in controversy. Before trial on the issues, the insurer paid the face amount of the policies, but denied liability for double indemnity, on the grounds that death was not directly caused by bodily injury effected solely through external, violent and accidental means, but was directly or indirectly caused by disease, or bodily or mental infirmity. The beneficiary obtained a jury verdict in the District Court, judgment was rendered thereon, and the insurer has appealed, contending that the evidence is insufficient to support the verdict. The ultimate question presented by this appeal is whether the verdict of the jury is supported by any substantial evidence.

The evidence on which the jury's verdict rests is not materially in dispute and may be summarized as follows. The insured had for many years lived in Ogden, Utah, where he was engaged in the grocery business. He had long suffered from an inflammation or chronic infection of the inner ear, having received treatments for this ailment since 1928. In the course of this treatment, a polypus was twice removed from the ear by surgical operation, half of the ear drum was destroyed, and the labyrinth, which regulates the equilibrium of the body, was impaired, rendering the insured subject to vertigo and dizzy spells. One of the attending physicians testified that the insured complained of dizzy spells, and frequently had to support himself while standing to avoid falling. Noises confused him, and moving objects in front of him caused him to lose his equilibrium and the control of the muscles of his body. The physician also testified that these reactions are peculiar to this particular disease, although not present in every case, and that anything which increases the pressure on the labyrinth of the ear disturbs the equilibrium. Another physician testified substantially to the foregoing facts. He had treated the insured for the same condition of the ears during 1936 and 1937, during which time the insured complained of ringing in his ears and dizzy spells. The evidence further showed that the insured suffered a heart attack in March, 1941, which was diagnosed as a coronary occlusion, and remained in the hospital under an oxygen tent for about a month. In October 1941, the insured made application to the insurer for total and permanent disability payments under the policies, in which he stated that he had been disabled from following any occupation since March 1941, and the medical reports to the company verify his representations. This application was pending at the time of his death.

The evidence further shows that on the morning of November 30, 1941, approximately twenty minutes before his death, the insured left the office of his physician where he had received a treatment for the diseased condition of his ears, from which the physician testified he obtained relief which should have lasted for several hours. He walked down the street in the opposite direction of his home until he reached a

railroad crossing. At this point, a train was moving slowly across the street in front of him. One witness testified that he walked with the insured until they reached the crossing, and both stopped on the curb about ten feet from the tracks and moving train; the witness crossed to the other side of the street, and when he looked back, the insured had walked to the center of the street and was standing about two and one-half feet from the side of the moving train, with his hands in his topcoat pockets. He saw Hassing go down on one knee, and "as I looked, he went down and his head went under the wheels." Another witness testified that he saw the insured walk out close to the freight train and stop, then he stooped over like he was looking in under the train, "then I saw him go headlong into the wheels—into the train. At the time, I thought he was trying to crawl under the train to get to the other side before the train had passed. That was the opinion I formed when he started going towards the train, and the next thing I knew, he was under the wheels. * * * Yes, there was a swaying of his head—the train was making considerable noise as it went by."

██ In order to recover, the appellee must bring herself within the coverage of the policies, and the coverage under the policies is measured by their plain and unambiguous terms and conditions. By their terms and conditions, the policies cover accidental death resulting from bodily injury, effected solely through external, violent, and accidental means, independently and exclusively of all other causes, and not resulting directly or indirectly from disease or bodily infirmity. Mandles v. Guardian Life Insurance Company of America, 10 Cir., 115 F.2d 994. Manifestly, if the death of the insured resulted from bodily injury effected solely through external, violent or accidental means, independently and exclusively of all other causes, it could not have resulted directly or indirectly from disease or bodily or mental infirmity. Lee v. New York Life Insurance Company, 95 Utah 445, 82 P.2d 178. Conversely, if the accident causing death was in turn caused by disease or bodily infirmity, death could not have resulted from bodily injury effected solely through accidental means. It follows that if disease or bodily infirmity is the direct or indirect cause of accidental death, the loss is not within the coverage of the policy as defined by its terms, and there can be

no recovery thereon. Mandles v. Guardian Life Insurance Company of America, supra; Clark v. Employers' Liability Assurance Company, 72 Vt. 458, 48 A. 639. The scope of our inquiry is not limited to the immediate or efficient cause of death, that is, whether caused by accident or disease, or the interaction of both. Cf. Browning v. Equitable Life Assurance Society, 94 Utah 532, 72 P.2d 1060, on rehearing, 94 Utah 570, 80 P.2d 348 (and cases cited therein). See also Lee v. New York Life Insurance Company, supra. Admittedly, the immediate and efficient cause of death was falling under a moving train, and the fall may be said to have been accidental. But as stated in the Browning case, supra, 80 P.2d page 352, "If the accident or injury resulting in the disability or loss was produced, caused, set in motion or operation by disease or infirmity, then it is indirectly caused by such disease or infirmity * * * and not of accident."

██ It is incumbent upon one asserting liability under a contract of this type, to show by a fair preponderance of the evidence that death resulted directly from bodily injuries, independently and exclusively of all other causes; effected solely through external, violent, and accidental means, which necessarily implies that death did not result indirectly from disease or bodily infirmity. Southern Surety Company v. Jones, 10 Cir., 57 F.2d 851; Travelers' Insurance Company v. McConkey, 127 U.S. 661, 8 S.Ct. 1360, 32 L.Ed. 308; Smith v. Mutual Life Insurance Company of New York, 5 Cir., 31 F.2d 280; Harrison v. New York Life Insurance Company, 6 Cir., 78 F.2d 421; Lincoln National Life Insurance Company v. Erickson, 8 Cir., 42 F.2d 997; Tuttle v. Pacific Mutual Life Insurance Company, 58 Mont. 121, 190 P. 993, 997, 16 A.L.R. 601; Lederer v. Metropolitan Life Insurance Company, 135 Pa.Super. 61, 4 A.2d 608; Mutual Beneficial Health & Accident Association v. Basham, 191 Ark. 679, 87 S.W.2d 583; New York Life Insurance Company v. Greber, 55 Ariz. 261, 100 P.2d 987; New England Mutual Life Insurance Company v. Flemming, 9 Cir., 102 F.2d 143. See, also, annotation 142 A.L.R. 742. The jury was so instructed, and its verdict was in the affirmative. If there are any facts or reasonable inferences to be drawn from the facts tending to support the jury verdict, it must stand, although the jury may have been justified in reaching a contra conclusion. But the verdict must find some substantially affirmative support in the

facts and circumstances. "* * * the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions." Lewis v. Ocean Accident & Guarantee Corporation, 224 N.Y. 18, 120 N.E. 56, 57, 7 A.L.R. 1129. But the law is not content with mere possibilities, conjectures, or surmise. The jury is not permitted to guess or speculate on the cause of death. New York Life Insurance Company v. Doerksen, 10 Cir., 75 F.2d 96; Brown v. Maryland Casualty Company, 8 Cir., 55 F.2d 159; Henry H. Cross Company v. Simmons, 8 Cir., 96 F.2d 482, 486; Pennsylvania Ry. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819. When we enter the realm of probabilities, as a permissible function of a jury, we should at least make sure that the probabilities relied upon to support the affirmative be equally as strong as the probabilities supporting the negative.

In Aetna Life Insurance Company v. Conway, 10 Cir., 102 F.2d 743, the real question for the jury was whether death was caused by a fall from a hospital bed, or by the disease from which the insured was suffering at the time death occurred. The court was not required by the terms of the policy to search for the indirect cause and this court held, in consonance with the Kansas rule, that the question whether the fall or disease proximately caused death was one for the jury under the evidence. In Kelly v. Prudential Insurance Company of America, 334 Pa. 143, 6 A.2d 55, 57, the insured was subject to spells of dizziness and vertigo. While descending a dark stairway, she fell and death resulted. The question there, as here, was whether the fall was the result of her tripping on the steps, and hence an accident, or was occasioned by an attack of vertigo or dizziness incident to a chronic condition of arteriosclerosis. The court upheld the jury verdict stating, "there was evidence from which it could be legitimately inferred that the fall which Mrs. Daley sustained was the result of a misstep which she made in the dark on the stairway * * *." There was evidence from which it could be reasonably inferred that the insured did trip or misstep on the stairway, and the case was properly one for the jury. In Bohaker v. Travelers' Insurance Company, 215 Mass. 32, 102 N.E. 342, 343, 46 L.R.A.,N.S., 543, insured was suffering from typhoid fever. While momentarily alone, in some unknown manner, he fell from his hospital room window and death resulted from the fall. The court sustained the verdict of the jury stating, "It may have been that the deceased, in the heat of his fever and the warm season, in an effort to reach fresh air went to the balcony just outside his window, and there without premeditation or purpose or delirium, but only through weakness, lost his balance and went over the low railing, and received mortal harm." The court held that it was a jury question whether the disease was simply a pre-existing condition, or the sole moving cause of the fatal injuries. The material distinction there and here is made plain by the language of the court. "The present policy does not stipulate that there shall be no recovery, if any other circumstance than the accident, directly or indirectly, wholly or in part, proximately or remotely contribute to the injury, as do some insurance contracts * * *. The policy in the case at bar does not go so far as to require the court to search beyond the active, efficient, procuring cause to a cause of a cause * * *." In Mandles v. Guardian Life Insurance Company of America, supra, the immediate and efficient cause of death was an accident, but the insured was suffering from a mental infirmity which set in motion the impulses which caused the accident. No other causes were suggested or shown by the pleadings, and we held as a matter of law that mental infirmity caused death, hence the beneficiary could not recover under the policy.

Here the evidence shows that the insured approached the moving train. He stood on the curb momentarily, turned and walked to the center of the street alongside the moving train where he stopped and faced the train. While thus standing with both hands in his topcoat pockets, he went down on one knee and under the moving train—death resulted. Here the evidence stops, and from that point the jury was required to speculate on the cause of the fall. There is no evidence or reasonable inferences from which it can be said that the insured tripped, slipped, was pushed, shoved, or otherwise impelled under the moving train. There is, we think, a reasonable inference to be drawn from the evidence that the insured's peculiar disease caused him to lose his equilibrium and become overbalanced, as a result of which he fell headlong under the moving train. Indeed, the facts seem to repel any other reasonable inference. But it is not essential to a verdict for the defendant that the evidence should repel any other hypothesis than the one advanced by it. It is incumbent upon plain-

718

tiff to take the case from without the realm of speculation, conjecture, and surmise, and to create a factual basis from which a reasonable inference can be drawn. Failing in this, plaintiff cannot prevail. New York Life Insurance Company v. Doerksen, supra.

■ In our opinion, the evidence fails to meet that degree of proof which we hold is essential to establish with any degree of certainty or probability that death was effected by accidental means, solely and exclusively of all other causes.

The judgment is reversed.

HUXMAN, Circuit Judge (dissenting).

I cannot agree with the majority. I think all the evidence presented an issue of fact for the jury; that the verdict of the jury and the judgment of the court find support in the evidence and should stand. The majority say that: "The jury was required to speculate on the cause of the fall." It requires more speculation to conclude that the fall was induced by the disease of the ear than that it resulted from natural causes. Dr. Helzel testified that he treated the insured within twenty minutes of his death; that the purpose of the treatment was to remove the pressure, and that when the pressure was removed his equilibrium was restored. He testified positively that the insured got relief on this day, which, in his opinion, would continue for several hours. The doctor further testified that Hassing appeared to be clear in his mind and was in that frame of mind when he left his office just before his death. He had walked to the doctor's office through some of the most congested traffic in town. His walk and actions after he left the office and up to the time of his death seemed perfectly normal to those who walked with him and saw him walk to the center of the street. There is positive testimony that he appeared to stoop over, seeming to look around an obstruction at an object on the other side of the train; also that he acted as if he were trying to crawl under the train. Certainly, if he attempted to do either of these things, it is not unnatural to assume nor would it be unusual if he lost his balance and fell. We can only reach the conclusion by speculation that the diseased condition of the ear caused dizziness which caused him to fall. There is no testimony that he had the condition of the ear at the time of the accident which produced dizziness. All the positive testimony leads to a contrary conclusion.